Arguments Not to Exceed, 15 minutes per side, Ms. Ellsworth for appellant. Good morning, Your Honor. May it please the Court, Jessica Ellsworth for Avient Corporation, and I've reserved three minutes for rebuttal. When Westlake initiated an arbitration in 2022 seeking a ruling on who is liable for specific costs, Avient objected to resolving that dispute through arbitration on the grounds that the arbitration agreement the parties had was invalid. The arbitration agreement is invalid. It makes arbitration non-binding by allowing for de novo judicial review. And yet the district court concluded that because of circumstances predating Westlake's 2022 arbitration demand, Avient can never challenge the arbitration agreement and is saddled with this unlawful arbitration agreement forever. But isn't there a waiver issue? There was a suit growing out of this dispute in 2017, and I believe your client waited until 2021 and 2022 to initiate this lawsuit. And actually, we have the problem that this Hall case as to whether your client should have subsequently initiated litigation after beginning to pursue the matter in arbitration. I guess this is yet a separate question. I don't mean to ask compound questions here, but there's also this question of whether your client was entitled to initiate litigation after beginning the matter as an arbitrator pursuant to a settlement agreement that provided for arbitration. Yes or no? Your Honor, I think there is a lot packed into your question, but I want to start with what I think are the very important facts to understand. This case comes to this court on a 2022 arbitration demand that immediately after receiving, Avient objected to. Avient said this arbitration agreement is invalid. This arbitration demand should not go forward. This suit should be enjoined. Your Honor referenced what happened back in 2017. It is true that Avient initiated an arbitration in 2017. When Avient realized after the Pottawatomie decision from the Tenth Circuit that the arbitration agreement was invalid, it tried to stop that arbitration. And the district court and a panel of this court said, you've waived stopping this arbitration. You started that arbitration. You started it, so you cannot come in. That was for different costs in the 2022? That's right. It's like 113 actions basically under CERCLA. They're very similar, Your Honor. And we know it has to be for different costs because the party settlement agreement says in sections 4.1 and 4.3b that a subsequent arbitration can only be about new costs, new facts, new circumstances. This is not about revisiting what has already been decided. A CERCLA site goes through various phases of investigation, remediation. What about Judge Clay's point that the Hall case comes out in 2008. It basically says you can't do this de novo judicial review of an arbitration award. Why shouldn't your client have figured this out sooner? That question is an interesting question. I don't think it really is one that this court needs to answer because litigation waiver is a case-specific inquiry, and the fact of the matter is as soon as this arbitration demand was made in 2022, Avian started making this objection. It had been making it for a number of years. It had already been to this court on this argument, but now it made it immediately. It remedied what a panel of this court had said was a problem the last time around, and it has been very clear from day one that this is, in fact, an invalid agreement. I think it's telling that the only case the district court pointed to to find there could be some sort of continuing waiver from pre-2022 conduct is the Gunn case because in Gunn what happened was you had a plaintiff file essentially five different lawsuits. They were groups of employees of Pizza Hut, filed five different lawsuits at the same time, and the court evaluated waiver when 15 months into those suits the defendant started raising an arbitration clause. That is nothing like this case. In order to be like this case, what would have had to happen in Gunn is that Pizza Hut had waived invoking an arbitration agreement. A new suit was filed over its Fair Labor Standards Act compliance, and somehow the second suit was also barred because of what had happened in the first. That's just not how litigation waiver is handled. There is really no case law that supports application of waiver here. Yeah, I understand your point. Then judicial estoppel, your point there is that nobody in the litigation concerning the 2017 arbitration, nobody was arguing about the validity of the arbitration agreement. Is that correct? That's exactly right, Judge Kessledge. I think the easiest way to understand that is that in this litigation, when it came back up, Westlake filed a motion to dismiss, and Judge Russell, who was the judge who had overseen the prior suit, in his motion to dismiss ruling is very clear, goes on for pages, about the only thing that prior opinion had addressed was the scope question and who should decide if something was an allocable cost. He didn't say, well, I already decided the validity. Actually, he goes on for pages about how no one had decided who should decide the validity of the agreement in that prior suit. So even Judge Russell himself didn't think that he had adopted a position or done an analysis of validity, and for that reason alone, judicial estoppel shouldn't apply. Tell me how that fits within the three-step analysis of judicial estoppel, because isn't that based on taking one position at one point when it appeared favorable to your own client, such as asking for arbitration after Hall was delivered in 2008, and then later reversing that position when it no longer seemed to behoove the benefit of the client? Your Honor, it fits directly into the three-step analysis at the second step. That's what I was talking about with Judge Kethledge, whether the district court had adopted a contrary position in the proceedings that were about Westlake's cross-demand for arbitration. Even the district court, Judge Boom, who inherited this case, said that Judge Russell, quote, did not conduct a validity analysis. He didn't. Judge Russell himself at the time said neither party disputed it, so he didn't address it, and in his motion to dismiss ruling, makes clear that validity and who decides validity is simply not something that has been addressed. There are problems with factor one and factor three of judicial estoppel too, and I just want to take a moment to mention them. Before you go into that, I hate to interrupt, but you said that the validity issue was not a matter here, but the district court's decision in 2017 explicitly stated that neither party disputes that the 2007 agreement containing the arbitration clause was valid. So the district court made that statement in its opinion. Was the district court wrong in that regard? No, Your Honor. The district court was right. Nobody was disputing it, and that's why the district court didn't need to do some sort of careful parsing of the validity because it wasn't an issue. If you think about a case where there might be some kind of what the Supreme Court has called a drive-by jurisdictional ruling, there's kind of a passing comment on something, but it's not a product of careful analysis. And if you look at the New Hampshire case that I think is the Supreme Court's main decision on judicial estoppel, the court goes out of its way to talk about how in that case New Hampshire had done this kind of searching inquiry about where the river boundary should be on its state line, put it in a consent decree that it then asked the district court in that case to bless, which the district court did. That is a very different circumstance from what we have here. Aviant's position in that earlier proceeding was not about the validity of the agreement at all. Aviant was asking for these particular construction claims to be litigated in court. Aviant's position was that they were not within the definition of allocable costs. They should not be subject to litigation. They weren't covered. They weren't covered. So you're representing to us that Aviant in that litigation never argued to the district court, this agreement is valid under the APA. That's right. There was no argument about it. It just employed that agreement over and over. Your Honor, there were two times that it had invoked arbitration. That is true. Well, you can only do it every five years, right? That is right. Within that time frame, it had availed itself of the benefit of that agreement in both five-year time periods. Correct? That is correct. And, Your Honor, I think that's very important for understanding where the district court went wrong on the unfair detriment prong, the unfair advantage prong, which is prong three of judicial estoppel, because the district court was very focused on the fact that somehow allowing the case to move to litigation, this new arbitration demand to move forward in litigation, would mean that all this expertise that the arbitrators had built up, all this familiarity with the record would be lost, and that that would be somehow an unfair advantage that Aviant would be earning from this. Well, that can't be right because the 2022 arbitration demand has not moved forward at all. There isn't even a panel selected. Nothing has happened. That has been stayed. So the district court's concern about there being some kind of loss of expertise for these arbitrators is simply misplaced. It was also concerned about the fact that not winning these arbitrations was the reason for this alteration. And on Step 3, I was concerned about the briefing on Step 3, frankly, because I'm looking at the argument that it is an unfair detriment to the opposing party. Your answer to that in briefing is this lawsuit does not seek to undo any of those proceedings, and you repeat it at the beginning and you repeat it in the reply brief. But then you say, if anything, then, earlier than it did gave Westlake an unfair advantage, and you defined what that was. Westlake received arbitral awards in its favor in arbitration proceedings that, if Aviant is right, took place under an illegal contract and thus were invalid. That sounds very much to me like a statement that undercuts the claim that you are not claiming that we will undo anything in the past and is, in fact, to me, a statement that you think, in the future, those past deals might be challengeable. And why would that not be a detriment to Westlake? So, Judge Strantz, let me try to be as clear on that as I can be, because I do think it's very important. Yeah, I do, too. Aviant does not in any way seek to undo anything about the arbitration decision that occurred on the 2017 arbitration. That is done. It is water under the bridge. There is a new set of costs as this site has been moving forward through the remediation phase. Now EPA has put in place kind of the remediation that's going to occur. One of the big costs here has something to do with removing mercury from wastewater discharge. I understand that. We have new costs. The decision you're making about new costs versus old costs. That's right. I understand that they're going forward. But there is an undergirding issue here. And your claim that we are not concerned about the past methodology or the past rulings, but that's immediately followed by a claim that Westlake operated and received the benefits of an illegal contract, which benefits were invalid. Now, I guess probably part of the concern here, to be frank, is that the position that your client has taken is let's arbitrate after 2008. I mean, it was all the way through the developing case law. And the arbitration provision was used over and over. Maybe unsuccessfully, but it was used over. And then there was a complete change in the statement to the court about the validity of the arbitration agreement. And that seems to me to impinge on the third step of judicial estoppel. So, Your Honor, I see my red light is on, but if I may please respond to that. Sure. That's okay. I think it is important to be very clear that we are not seeking to undo that past arbitration agreement. Saying it is invalid sometimes is a matter of waiver, which is what this panel held before. We had waived our right to challenge it. So it may be invalid, but we cannot challenge it. That is water under the bridge. What is not water under the bridge is what happens with these new costs. And if you think about the purpose of judicial estoppel, it's really to stop courts from being misled and some sort of unfair advantage from being gained. I'm not aware of any case that has suggested that before an arbitration has started, before there's any indication of how these new costs, this new wastewater treatment construction that has happened, there's simply nothing that is going to indicate whether this is going to go favorably for Aviant, favorably for Westlake. It's a new set of costs before a new panel of arbitrators. The problem with the past arbitration, and the reason we said, if anything, it was unfair to us, is because we had a contract that said we would get de novo judicial review. We can't invoke de novo judicial review. Hall Street makes that clear. So this arbitration preceded it. We've been in the red for a while. So I want to just get one issue on the table before you sit down, which is just cutting to the merits on materiality. The effect of invalidating the de novo review provision is simply you get APA review, right? I mean, you could still come to court and get the much more deferential APA review, but that's what most arbitrants get, right? That would be the upshot of invalidation if you don't, if we didn't, I mean. So I don't think that's right, Your Honor, because there's a severability clause. No, I get that. I mean, what I'm getting at is why is it material when you have a symmetrical application now or availability of APA review rather than de novo review? Why is that like the end of the world here where this whole arbitration agreement, which presumably you entered into for substantial reasons, why we should now just throw that out? Why wouldn't we take the more modest approach and say it's not the end of the world, you know, and it's not material and you just have the agreement for everything else? So, Your Honor, I think there are two things that I would point you to to answer that question. One is the Tenth Circuit's reasoning in the Pottawatomie decision. No, I know. I mean, severability is just an exercise in counterfactual, fictive reasoning to begin with, you know, and like how we're supposed to figure out what you all would have done. But I understand that case said what it said. It did say what it said, and it did what I think is really important. It started with the plain language of the contract to get at the party's intent as to whether this would be material. And here it is clear that the party's intent was that an Article III judge would be available as the final judge. I mean, the party's intent is always to have the provision that's getting invalidated, so that's always true. That's right. I guess why is it such a big deal that you would have this more deferential APA review rather than, I mean, like whoever thought you could actually get de novo in the first place? I mean, they never looked at the case law. But why is it such a huge deal? Your Honor, it is a huge deal because the FAA review that is available to courts is exceedingly narrow. This court has described it as among the most narrow. I had a case where we set it aside because neutral wasn't neutral. I mean, but. It does on rare occasion happen, but it is exceedingly narrow. But people do that all the time. All the time they live with that. So why is it so intolerable in this setting? If you think about the fact that arbitration is intended, arbitration is a matter of consent. Right? It is a matter of contract. It is a matter of consent. What the parties consented to here was non-binding arbitration.  We're going to have to leave. I get it. I appreciate your answer. I don't want to get in trouble, so. Thank you, Your Honors. Yeah. Thank you. Good morning. Please support. I think I'd like to start with judicial estoppel because that was discussed a bit. Are you Mr. Super? I am Mr. Super.  Sorry about that. That's all right. Before I start, though, I just want to, I think there's one overarching point that is important here. It really cuts across all of the arguments. Claim preclusion, waiver, judicial estoppel, and even this question of materiality. And that is there really aren't any cases with a fact pattern that comes close to this. I mean, here we've got a party over a course of ten years that enforced an arbitration agreement and never paid one bit of attention to this clause allowing for a separate judicial determination. And then only when that party saw that it was losing in an arbitration that it initiated did it decide to turn around. It's also only after the Tenth Circuit connects the dots. Well, that's true. This is actually illegal and material. So, I mean. To that, I would say that this court in its 2019 opinion kind of already addressed that issue and said that once Hall Street was issued in 2008, that was the basis for Avian to challenge this Section 6, this judicial. It's a basis, and it could have, but. It absolutely could have. You know, I mean, we decide cases on the merits. That's a pretty strong default as opposed to contrary to them. And so doctrines like waiver, estoppel, and so on are the exception where we will actually decide cases sometimes contrary to the merits because somebody has forfeited or done something. I think that's fair to say. And so, I mean, as to the argument that, oh, they should have just, you know, gotten right on this after Hall. So, are we going to say that parties waive their, knowingly relinquish their rights for lack of like good legal advice or legal acumen to anticipate and connect dots or see implications? This would require no dot connecting, Your Honor. I don't, you know, I mean. As this court said in 2019 in the opinion, reflecting what Judge Russell had said in his opinion, that once you determine that this provision is illegal under Hall Street, the rest of the analysis, which is actually required under this court's precedent, is to apply just garden variety contract principles to see whether there's a severability clause, look at the materiality analysis. Let me finish. Okay. The outcome, I mean, in the Tenth Circuit case is not just like so obvious that, I mean, that it's severable, or that it isn't severable, that it is material. I mean, but when have we ever said that a party waives its rights for not being sufficiently, you know, not having sufficient acumen to see implications? I mean, we don't say that people knowingly relinquish rights because they didn't get good enough legal advice about the implications of a Supreme Court decision. I've never seen that. Well, I think that is what this court said in the 2019 opinion. That was a glaringly obvious problem with the provision of the contract, and all it took was to then perform a basic contract analysis to see what impact that had on the rest of it. Well, this court pretty carefully reserved the issue that's in front of us today. This side of the table knew it for sure. We were well aware of the impact of Hall. I've just, I've never, I won't belabor it, but I've never seen the case where we said somebody waives their rights because they didn't figure out a valid argument sooner than a circuit court did. Well, let's maybe talk about judicial estoppel then, because there, on the inconsistent positions factor, the position that Aviant took in the 2017 lawsuit before Judge Russell, that the arbitration agreement was valid cannot be reconciled with its position today that the provision is not valid. That's different. I mean, that's different than saying they specifically argued invalidity, because they didn't. Well, Your Honor, I would respectfully disagree with that. They did not use the word valid anywhere in their pleadings, but please take a look at what their pleadings in the 2017 lawsuit do say. So, I mean, what did they say? The complaint says the parties had an arbitration agreement. It says they were required to arbitrate. It says that Aviant, in fact, had relied upon that arbitration agreement to file the 2017 arbitration. And then in their opposition to Westlake's motion to compel arbitration, Aviant admitted that the parties had, quote, agreed to arbitrate the allocation of certain environmental costs. Now, Your Honor, those allegations, those allegations in their pleadings, which they are bound to, are impossible unless you've got a valid arbitration agreement. Right, but nobody's even thinking about whether it's invalid on the specific grant. The district court never holds that it's notwithstanding Hall, this is valid. Nobody says that. I would respectfully disagree with that as well, because under Section 4 of the Federal Arbitration Act, which Judge Russell applied in this court in its 2019 opinion, referred to the fact that he applied that, there is a requirement that the district judge find that the parties are bound to a valid arbitration agreement. That was the initial finding he had to make, and I think their argument sort of boils down to, well, we made it too easy for him. We just admitted that there was a valid arbitration agreement and no one fought about it. Do you disagree with Judge Russell? I mean, Judge Russell says he didn't decide the particular validity issue that's before us today. He said, I mean, the district court has uniformly said it did not decide that issue. Judge Russell, in his opinion, said neither party disputes that we've got a valid arbitration agreement. I know what he said, but I'm operating at a little bit different level of generality than I think you're arguing at, which is whether they argued the specific validity issue or invalidity issue that they're arguing now, and whether the court, in granting them some relief, adopted that particular invalidity argument. And the problem is, yes, everybody thought it was valid because they signed it, et cetera, but nobody argued the particular invalidity argument, and hence the court never adopted a position as to the issue before us today. So what they're saying today does not specifically contradict any position they took before. Well, Your Honor, I would – That's the way estoppel works. I would disagree with that based on what this court has already held in 2019, that it was incumbent upon Avian to raise the invalidity issue. As of 2008, they knew about the issue. I mean, that's the same issue. It's all this, like, you know, there were these implications that are inconsistent with what they're arguing now, so don't look at the merits. We look at the merits unless somebody specifically relinquishes that right or takes some action that is just totally inconsistent with it, gets a court to buy the opposite proposition. It's not all these third-order conclusions that are removed from the actual thing they want us to adjudicate today. Again, sorry to push back on that. No, that's your job. I'm trying to tell you my concerns with your argument. To address those concerns, I think what addresses those concerns are two points. Point one, this is an issue that Judge Russell, as a matter of law, as a matter of Sixth Circuit precedent, which case is it, the Great Earth v. Simmons case said you've got to look at whether there's a valid arbitration agreement before you compel a party to arbitrate under Section 4 of the FAA. And, of course, that requirement's embedded within the language of Section 4. So it's an obligation that Judge Russell has to find a valid arbitration agreement. That's point one. Point two is, as this court held in 2019 in the first, probably one, v. Westlake case, as soon as Hall Street was issued in 2008, it was incumbent upon the lawyers, if they wished to make an argument that Section 6 was invalid and had some impact on the arbitration agreement, it was incumbent upon them to make that argument. In that, for purposes of that arbitration, not this one. Nine years before it was true. They were saying for that, they're deciding that arbitration, not this one. And they're saying for purposes of that arbitration, which these guys, I mean, which they initiated, you know, you needed to figure this out sooner. But this is a different arbitration now. Well, Your Honor, I'm not. It's a different case. I understand that argument. It's different costs. They didn't start it. At some point, I mean, don't they get to argue the merits of their thing? They got turned away here because they started it. They didn't start this one. So why shouldn't we give them their day in court on this issue? Because of judicial estoppel, because of claim preclusion, and because of waiver. And actually, this court in the Schwebge case said that a waiver analysis, you look at the totality of the circumstances. And Aviant's entire ploy here to avoid a waiver analysis in this case is to say, to put blinders on and say whatever happened in the ten years before just doesn't matter. It's a case-specific analysis. Well, Your Honor, it's not. We're not asking this court to say waiver applies here because it applied in an earlier case. What we're asking the court to do is to apply that same body of facts to this case and find waiver. And, by the way, the facts are much stronger now because, in addition to all the facts that applied before, this time, after this court in 2019, in the opinion, said Aviant can file a declaratory judgment regarding this validity issue, Aviant sat on its hands for three years. It did nothing. Their excuse now is they say they had no standing. Frank? But one other fact is they sent us a letter in April of 2020 saying there were some costs that were at issue. And the assistant general counsel for Aviant writes a letter to Westlake saying, you must arbitrate those costs. You must do it. So we did. There's a scope issue there. I disagree. I'll let Judge Stranz go. To me, I understand that damages are different or harm is different or bills that need to be repaid are different in each arbitration. I was conceptualizing this a little bit differently because, obviously, if you have an ongoing relationship with an arbitral group to resolve things going forward that you know are going to continue to arise, then each time you are going to be looking at different bills because a different bill was sent. But I thought the waiver concept here was inherent to your position on how these matters are resolved. So am I incorrect? I may well be, and your opposing counsel may explain why. If you take the position all along when you are bringing the request to review those new bills that arbitration is the way we go, I know we've got Hall in 2008, I know there's developing law, but this arbitration agreement governs what we do, so we will go forward. And then you change this whole conceptual basis on which you have been operating to decide. Now we are going to decide that this particular set of new bills authorizes us to look historically in a different way at what we have been claiming is the governing document. Is there a distinction between that conceptual basis and these individual suits? Because if there's not, then you can change every time. Well, Your Honor. Can't you? The next time around you just say, now I'm going to say it's okay. I think that's another prong that supports their waiver, because every time they pay an invoice, they're paying that invoice subject to their ability to recover those funds through arbitration. In fact, they paid something like 400 invoices for over $40 million over that 10-plus year period. In fact, they were still processing invoices after this Court's 2019 opinion and not filing a declaratory judgment action seeking to challenge the validity of the arbitration agreement. And again, they wrote us a letter two years later saying you must arbitrate. One thing I really wanted to get to, because it was an answer to one of your questions, Judge Kattelidge, that's just not correct. If we go back to federal court, this is not a run-of-the-mill 113 action. It just isn't. I was just trying to understand the context. It's important, because Judge Russell actually ruled back in the 2003 lawsuit that started this whole thing that these claims are not governed by CERCLA at all. It's cross-indemnities. Yeah, I was just taking a stab. No, I understand. Just to understand the substantive precinct we were in. It gets to the prejudice point, and Judge Stranz, I think you were on this, that no, they say they're not trying to reverse the 2019 arbitration award that we won. That held them 100% responsible. But they couldn't. I mean, you've got a final judgment that broomed that particular action in federal court. They can't, but, Your Honor, that opinion, that award, in addition to allocating all the costs to them, also made very critical rulings about the burden of proof, about what evidence you needed to show to change the allocation. What they want to do is not have that arbitration award applied in the pending arbitration by a new arbitration panel, because that document will be the Bible. And they know that. They're trying to escape the application of that arbitration award. If we go to federal court, goodness knows how the court will treat that arbitration award. We'll be kind of back in the prior patch. And as Adam Goble and I were the only ones in this room who were litigating back in 2003 and 2007 in those cases, and that was trench warfare. The parties entered this arbitration agreement to avoid that situation. We don't want to go back to a place where a judge like Judge Russell. We have three weeks. We litigated. It was a four-year slog that resulted in nothing but a settlement agreement. We, in the 2017 arbitration, we completed what was easily a four- or five-year litigation in about 18 months, because the agreement required us to. It's got limits on discovery. It's got a very tight schedule. You have to get it done in a certain period of time. And that is what the parties wanted. They didn't want to go back to 2003, 2007, and then be litigating where there's a discovery dispute once a week, et cetera. And that arbitration agreement allows us an agreed-upon way to march forward and resolve this very complicated, very expensive site. You only get one arbitration every five years. When you file a new arbitration, it cannot cover only facts and circumstances that are new, can be brought in the new arbitration. So if that all goes away, then will all of these disputes be brought in this court? It all goes away. And another critical thing that goes away is the arbitrators were empowered to do an allocation, and they can do that allocation, most importantly, prospectively, to cover future costs in the same general category. And unfortunately, a district judge does not have the authority to do that. It's not a simple allocation case. It's a very complicated one. Both sides of the table recognized that, and that's why we agreed to an arbitration structure. Those would be arguments as well that go to materiality. And I'd love to address materiality. I'm out of time. If Judge Kessler would like to.  Yeah, I mean, Judge Clay's been very kind. You want to give us? You use the words, it's not a big deal to get rid of Section 6, and it's not. The parties have already gotten rid of it. They have not enforced this provision, neither party, and it hasn't enforced it despite the fact that they've lost badly in the one arbitration verdict we got. Neither party has acted like Section 6 matters one bit to them. We've known since 2008 that it's not an effective provision, and yet both parties, particularly Aviant, has filed two arbitrations. It filed a lawsuit enforcing the agreement, and it treated Section 6 as a dead letter. As Judge Boom recognized, neither party has ever enforced that, moved to enforce that provision, and both parties have agreed that it's invalid, so it's a dead letter at this point. And that's why I think Judge Boom's handling of it, just sort of treating it as an appendix that will never get removed, followed what this court did in 2019. Just real quick, what would you say in opposition to the Tenth Circuit's reasoning with a pretty similar? Well, I think the Tenth Circuit was looking at a different agreement. Critically, the review provision was co-located in the same section as the arbitration provision, but more importantly, the arbitration right was directly conditioned upon the enhanced review. In our contract, they are completely separate provisions. In fact, one last point, in their reply brief for the first time, Aviant referred to Section 4.4, and that actually defines the arbitration agreement. It's Section 4, Section 5, and Exhibit C, and it excludes Section 6. They are separate provisions. They're not contingent upon one another, and if you strike Section 6, it just drops out of the agreement, and we can march forward with that arbitration agreement. All right. Thank you. Thank you for the extra time. Your rebuttal. If I may, what do you think of that? I mean, there is a difference. It's not so interwoven with other parts of the agreement. Nobody's ever invoked this. Why isn't that a fair point? Your Honor, I'm glad you asked. I think it is even more intricately involved in the agreement here than in Pottawatomie. When I counted it, I believe there are more than a dozen references throughout the entire settlement agreement to the judicial review provision telling you that it is a key part of the agreement, and in fact, Section 6.3C specifically goes out of its way to say the parties agree they shall not dispute a party's right to bring a claim for judicial relief as provided for in this Section 6. So it was so important they even put in the agreement that no one could later dispute that they could exercise this de novo review provision. Code of silence about invalidity or something there? That's right. That's right. And I think the other important piece for materiality and understanding that is to look at Section 4.4 of the agreement because Section 4.4 of the agreement spells out that if the arbitration provisions are unenforceable, the parties can simply return to litigation in the Western District of Kentucky. So the parties understood that the arbitration agreement might fall out of the agreement, and if so, it set out exactly what would happen, which is that the case would return to litigation in district court. What about Mr. Super's point that the arbitration process, which you have invoked, your client has invoked in the past, has yielded these certain precedents, certain rules, determinations that would be common to most, if not all, arbitrations in this matter. There's a body of precedent and knowledge and experience that's been built up that's valuable and that would be detrimental to them to lose if at this point you're able to get this thing invalidated. Why isn't that prejudice that we ought to take account of here? Judge Kessler, I think that dovetails with some of what Judge Stranch and I were talking about earlier, which is whether there really is this expertise that exists when you're at the threshold of a new arbitration in front of a new panel that will have to decide for itself a new, exactly— Aren't there going to be—go ahead, Jane. Help me understand how there's not expertise even in a new arbitral panel because there are requirements in the arbitration agreement about their expertise. And those arbitration—I was trying to find the precise amount of time. Those were heavily invested in arbitration proceedings before people with the expertise to understand them, not regular judges. And what did you have? You had three weeks of expert testimony. You had five years of arbitral activity and collection of information and presentation to these arbitral panels. I don't understand how you can think that there is not a distinction with an expert arbitral panel that is making allocations that are going forward. Even if they're old bills, they are old bills for a particular service rendered on a particular Superfund site. And if you don't have that, if you each time go back to the district court with the dispute, are you going to have—if you lose those things, are you not going to have the old agreement that carries forward because those experts explained how you pay this particular invoice? Now you've got a different dollar invoice, but it's for the same type of service rendered. So, Your Honor, I think that is where there is a mistake. Or do we have a disconnect? Educate me. Because what we're talking about now are very different types of costs. So first, in a site like this, you have to investigate, is there actually contamination of the soil? So there are costs around that. Now you get into, when you move forward in time, now we are constructing—and this is an operating facility. So Westlake is running its own operations on this land. It's building new buildings. Some of what is happening will be related to remedying past contamination. Some of it will be about present contamination. So the questions in this arbitration relate to this new phase that the site is in. So they are no longer the same allocation questions that were previously decided. And I think that is very important. It's not just new invoices for the same old costs that have already been subject to the 2017 allocation. At the end, I would— So you're representing that you're only looking at the new work of Westlake now and that all the remediation for the entirety of the super site has been resolved? Your Honor, what I would point you to is, if I can quote to you from Section 4.1 of the agreement, it says that a subsequent arbitration may only seek to allocate costs, quote, based on acts or omissions, events, conditions, developments, data, or circumstances that have occurred or changed since the date of the notice of the prior arbitration. So it's only new things that have occurred or have changed since the prior arbitration. That's really important because it is not trying to retread this water under the bridge from the old arbitration. It is looking at the things that are new and different. And that is why this is a new and different analysis. We are at the threshold of it. We do not know how it will land. This court has a preference for resolving claims on the merits. If this court affirms, there will be no opportunity for Aviant to get a resolution on the merits. It will be saddled with this unlawful arbitration agreement forever. Well, real quick, I mean, but I think Mr. Super's point is that there are plenty of events, conditions, developments, et cetera, that are common to all these things. And I'm giving you a chance to explain why that's not true. I mean, this says the new one can only be based on acts that have occurred or changed, but the implication is there are some acts and occurrences and so on that haven't changed, and those carry forward determinations about those might carry forward. Why isn't that a significant consideration? They do carry forward in the sense that they remain governed by the prior arbitration. That's not what this new arbitration is about. I know, but isn't that an important reason to say, well, you know, there's a prejudice to leaving the arbitration process because all of that is lost, and now you have to litigate it anew, et cetera? Your Honor, I think it's exactly the opposite. If there were a way to upend those aspects of the old arbitration from carrying forward, that, I think, could be a valid basis for claiming prejudice. But where those will remain in place and the question before the arbiter, which is required under Section 4.1, is that only the new circumstances, the changed conditions, those are what are going to be addressed, then you just don't have that concern about the carry forward because we're not talking about the carry forward. That's not what this arbitration is about. And in a Superfund site, those are not intertwined issues? I mean, how you're building the new things that are being done on that site to do vinyl production or whatever else they do are on that site that has already been declared a Superfund site and has been required to be remediated. How can the actions of the current occupant not tie to the land in its required remediation and perhaps even impact the prior order for remediation? They certainly might, and that's why the allocable cost determination has the opportunity. Whoever the decider is, an arbitration panel or the court, will decide how to allocate those costs between these two parties. We're not saying that there is a carry forward in what the actual allocation is. That's the ultimate merits question at the end of the day once we get beyond the merits of whether this is, in fact, an enforceable arbitration agreement or not. That is certainly something that could be a subject of debate. The question is where it should be debated. And we provided an extensive array of cases from the personal jurisdiction context, the sovereign immunity context, the arbitration context. That's a very different context. Well, but what they all show, Your Honor, is that consent to proceed in one forum in one case does not limit you from making an objection to the forum in a different case. In fact, the district court Bischoff case that we cited called it, quote, absurd to think that because you didn't invoke an arbitration agreement or you did in one case that you were somehow bound to that in later decisions. A party can choose to remove in one case, not in another. For all of these reasons, we would respectfully request that this court reverse the judgment below, hold that the arbitration agreement is unenforceable, and bring to a conclusion this case. Thank you, Your Honors. Thank you. And the case is hereby submitted.